# Mathews *et al.* *v.* Sheldon.

### *Bill in Equity to cancel Trust Deed.*

*Statutory separate estate ; what does not constitute mortgage of.*—A married woman received direct from the owner a conveyance of real estate, paid for and improved by the husband wholly with funds drawn by him out of a firm of which he was a member, and to which he all the time remained a debtor. Afterwards the husband induced the wife to join him in a conveyance of the property, as security for the payment of a loan made to the firm, on the faith of the security, to relieve it from embarrassment, and to be used in carrying on its business. At the time of the purchase neither she nor her husband owned any property. The loan not having been paid, and the firm having failed, the property was sold under the deed of trust :

*Held*—1. That the property, although conveyed directly to the wife, was liable in equity for the satisfaction of the debts of the firm.

2. That the effect of the wife's conveyance being to convert the property into a security for the satisfaction of the firm's debts, a purpose to which a court of equity would devote it, neither the conveyance nor a sale under it, would be set aside at the wife's instance, as presenting a case of mortgage of her statutory separate estate for the payment of the husband's debts.

APPEAL from Chancery Court of Mobile.

Heard before Hon. A. C. FELDER.

This was a bill filed by Mrs. Sheldon against the appellants, praying that a certain trust deed, executed by her and her husband, and conveyances under it, be cancelled, &c., as presenting the case of a mortgage by a married woman of her statutory separate estate in payment of the husband's debts. The chancellor granted the relief prayed and hence this appeal.

WM. G. JONES and HAMILTONS, for appellants.

[Mathews *v.* Sheldon.]

HERNDON & SMITH, and LABUZAN, *contra.*

MANNING, J.—In this case it is conclusively proved, that the house and lot in controversy and the improvements thereon were paid for by Mr. Sheldon out of the moneys of the firm of Parker, Lake & Co., of which he, at the time of the purchase, was book-keeper, under an agreement that in five or six weeks he should become, as he did, a partner in it.   In the latter relation he was to receive one-fifth of the profits, and after some time, in the next year, one-fourth, without putting any capital into the business.   The improvements seem to have been made chiefly after he became partner ; and the cost of house and improvements amounted to about $8,000.

At this time, the latter part of 1865, and 1866, the firm was doing a large and apparently prosperous business; but owing to the failure of its customers to pay, it became embarrassed early in 1867, failed later in that year, and in the spring of 1868 went into bankruptcy.

When the firm advanced money, about $2500, in October 1865, for the first purchase of the house, Sheldon became debtor for that amount to the firm of Parker, Lake & Co., and on opening new books, upon his becoming a partner, the amount he owed was carried to his debit in them.

These books have been destroyed by fire, and therefore, no copy of his account with the firm is produced.   But the testimony tends to prove that in his desire to settle and maintain his family well, and in a reasonable anticipation of a prosperous business to the firm of which he had become a member, his account was overdrawn, and he was always a debtor to the firm.   In 1866, balance sheets or accounts were taken, by which it appeared that Parker, Lake & Co., had done a thriving business and made large profits; but these profits were not moneys in hand; they consisted largely of the credits of the firm, the moneys due to it from its customers.   Considering these as money, a division was made of the supposed profits, and each partner was credited with his share thereof.   Yet, even after this, according to the testimoney, Mr. Sheldon remained debtor to an amount exceeding the cost of his house and improvements.   The other moneys he had drawn were probably used chiefly in the maintenance and support of his family.

There is some contradiction in the testimony of Mr. Sheldon and that of Mr. Lake, one of his co-partners, in respect to the understanding between them about his taking the conveyance of the house and lot to his wife, the appellee, instead

[Mathews v. Sheldon.]

of to himself. But we do not consider this a matter of importance. Neither he nor his wife had any fortune; he was living upon his wages as clerk, and had not saved anything from them. And upon his attention being called by Mr. Lake to the fact that while the money expended on account of the house and lot had been furnished by Parker, Lake & Co., the title had been taken to Mrs. Sheldon, Mr. Sheldon replied that he would make that right, or that he would fix that all right; and on the next day he called Mr. Lake's attention to entries he had made by which he, Sheldon, was credited with $8,000 on the books of Parker, Lake & Co., and "real estate" was debited therein with the same amount, so as to show that the property belonged to the firm.

The fact seems to be that the other members of the firm had very great confidence in Mr. Sheldon, who had been their book-keeper since the war, and that he had great confidence in the good fortune and success of the firm of Parker, Lake & Co., of which he had become a member. There does not seem to have been any designed wrong done by him towards them in this transaction.

But the prosperity of the house was only apparent. Its customers failed to pay up, and in the spring of 1867, it sought to sustain itself and meet its engagements, by borrowing money, and as part of the security for the repayment of this money and interest, Mrs. Sheldon reluctantly, but voluntarily, joined her husband in executing the trust deed of the house and lot, which with others, from the trustee to a vendee, and from him to a subsequent purchaser, she prays by this bill to have cancelled and set aside. The appellant is this subsequent purchaser. She paid her money for the property, and the money went to repay the creditor who lent his money to the firm, in its time of need.

On the part of appellant it is insisted that Mr. Sheldon was not a competent witness for his wife, and that the cases heretofore decided in this court, in which husband or wife was held competent to testify for each other, were cases in which the husband or wife testifying was the trustee or agent of the other, and for that reason, and as an exception to the rule, was permitted to explain as a witness transactions done in that capacity. This appears to be according to the fact; but we do not think it necessary to decide the question of Sheldon's competency to testify on behalf of his wife, in this cause. See *Lucas* v. *Brooks*, 18 Wal. 436; *Wilson* v *Sheppard*, 28 Ala. 623.

The evidence is very clear that the house and lot in controversy was bought and improved with moneys of the firm

[Mathews v. Sheldon.]

of Parker, Lake & Co.; that though the property did not become theirs by the purchase, Mrs. Sheldon never paid any thing for it, but is a mere voluntary grantee of the property, through her husband; that as her husband became debtor to Parker, Lake & Co. for the amount of money, with which the house was paid for and improved, they would have a right to resort to it to obtain payment of his debt to them; and that this debt for which the property was liable, was a part of the assets of Parker, Lake & Co., which they were under obligation to have applied, if necessary, to the payment of their debts to their creditors. A court of equity upon proper proceedings on their behalf, would have subjected the property to the payment of such debts.

When, therefore, Mrs. Sheldon and her husband made their trust deed of the property to Gibbons to secure payment of the money borrowed in the spring of 1867, of the Smiths, to sustain Parker, Lake & Co., in business and credit, they did only what in equity they were bound to do, and to the extent of the value of the property they paid to Parker, Lake & Co., Sheldon's debt to the firm. And it is well settled that a court of equity will not lend its aid to undo that which in equity ought to have been done.

It has been ingeniously insisted in the able argument for appellee, that voluntary deeds will not be set aside in favor of subsequent creditors, except when made with the intent to defraud; that the facts show that there was no fraud meditated in this case, and that the Smiths became creditors more than a year after the trust deed was made, hence it is argued the property was not liable for the payment of the debt to the Smiths, and the trust deed made to secure payment to them, being the conveyance by a married woman of her statutory separate estate, as a security for money borrowed for the benefit of others, is absolutely void.

We recognize the doctrine that if a husband or father without any actual fraudulent intent make provision by a voluntary deed for his wife or child, at a time when his other property is amply sufficient, or appears and is considered so, to pay all his debts—even though some of these should be unpaid—a subsequent creditor cannot have the voluntary conveyance set aside, as fraudulent, and the property subjected to the payment of the same due to him, although as to an existing creditor it would be voidable. 1 Stor. Eq. §§ 351, 362; Stiles v. Lightfoot, 26 Ala. 443; Gardner v. Boothe, 31 id. 187.

But Sheldon was not able, or believed to be yet able to pay his debts, especially the debt he owed to his firm. And it

[*Exparte* Branch & Co.]

was for their benefit, who were his creditors at the time and ever since the voluntary conveyance was made, and to enable them in their strained circumstances to obtain assistance, and also for the benefit of their creditors, that the trust deed was executed. And it was in recognition of the right of the firm to the value of the property in payment of Sheldon's debt to it, that the entries were made, by which "real estate" was debited with $8,000, and his account was credited with that sum—in order as he says—"to reduce [his] indebtedness on the books," and "because [his] account showed a large balance against [him] at the time."

We think that Mrs. Sheldon has not made out a case entitling her to the relief she seeks. The decree below must be reversed, and her bill be here dismissed.